## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**MARY KAY DUFFIE**,

           Debtor.

Case No.  **13-61593-13**

**STEVE and SHARON GOTCHER**,

           Plaintiffs.

-vs-

**MARY KAY DUFFIE**,

           Defendant.

Adv No.  **14-00013**

# MEMORANDUM of DECISION

At Butte in said District this 3rd day of June, 2015.

After due notice, trial in this matter was held March 30, 2015, in Butte on Plaintiffs'

claim to except $88,348.61[1] from the Debtor/Defendant's discharge pursuant to 11 U.S.C. §

---

[1]  Plaintiffs fail to specify a specific amount of damages in their complaint, but state on page 8 of the complaint that Plaintiffs paid Duffie $87,000.00.  Plaintiffs also allege on page 8 that they are entitled to an unspecified amount of interest they paid on money they borrowed and paid to Duffie, and that they are entitled to recover interest on the money they paid to Duffie.  As the Court will discuss below, the evidence shows Plaintiffs paid Duffie, through SRO LIVE, the sum of $88,348.61.

1

523(a)(2)(A).[2]  Plaintiffs Sharon Gotcher[3] and Steve Gotcher were represented at the trial by

Kevin E. Vainio of Butte, Montana.  Sharon Gotcher ("Sharon") and Steve Gotcher ("Steve")

also appeared and testified.  The Debtor/Defendant, Mary Kay Duffie ("Duffie") was represented

at trial by Mark Hilario of Billings, Montana.  Duffie did not appear at trial.  The parties

stipulated to the admission into evidence of Plaintiffs' Exhibits 1 through 42, and Duffie's

Exhibits A through OOO.

Plaintiffs' counsel, upon learning that Duffie was not going to appear at the trial,

requested that pursuant to F.R.EVID. 801(d)(2) the transcripts of Duffie's Rule 2004 examination

and affidavits from a state court proceeding be admitted into evidence as statements of an

opposing party.  Because Duffie's counsel had stipulated to the admission of Plaintiffs' Exhibits

1 through 42 into evidence, that motion was granted.  *See* Order at docket entry no. 87 (The

exhibits that were stipulated into evidence include a Christmas letter at Exhibit 25, a Second

Affidavit of Duffie at Exhibit 27, and a transcript of Duffie's Rule 2004 examination at Exhibit

31.)  At the conclusion of the trial, the Court granted the parties time to file post-trial briefs.  The

parties have filed their post-trial briefs and the matter is ready for decision.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334, and all issues before it are core

matters on which it may enter a final decision under 28 U.S.C. § 157(b)(2)(I).

---

[2]  In a Memorandum of Decision and Order entered November 13, 2014, the Court dismissed all Plaintiffs' claims for relief, except for the claim under 11 U.S.C. § 523(a)(2)(A). Consistent with the foregoing, at the commencement of trial, the Court struck the reference to 11 U.S.C. § 523(a)(2)(B) found on page 4, paragraph 9 of the Pre-Trial Order filed on January 26, 2015, at docket no. 70.

[3]  Plaintiff Sharon Gotcher has also gone by the name Sharon Westrom.

## BACKGROUND

On November 10, 2010, Duffie, d/b/a SRO LIVE[4] and as buyer, signed an Agreement for the Sale of Real Estate, seeking to purchase from Bozeman Rialto Redevelopment, L.P., as seller, property located at 10 W. Main St., Bozeman, Montana and referred to as the Rialto Theater. The price Duffie agreed to pay for the Rialto Theater was $1,107,946.14.  Duffie paid $5,000.00 earnest money on that purchase, with the balance of $1,102,946.14 payable according to stated terms.  After payment of settlement charges, city and county taxes and an insurance proration, Duffie paid a gross total of $1,109,807.45 at closing.  The Agreement for the Sale of Real Estate contains an assignability clause on page 9 that reads: "This agreement shall not be assigned in whole or in part nor shall an interest in the premises be transferred or conveyed by buyer without obtaining the written consent of the seller prior to said assignment or conveyance, which written consent shall not be unreasonably held."  A Notice of Agreement for Sale of Real Estate was recorded in the office of the Clerk and Recorder of Gallatin County, Montana on November 12, 2010, giving notice of the Agreement for the Sale of Real Estate.

On December 10, 2010, Duffie, with an address of 8050 Lupine Lane, Bozeman, Montana, and Stephen Michael[5], d/b/a SRO LIVE of 1346 The Alameda, Suite 7-205, San Jose,

---

[4]  The name SRO LIVE was registered at the Montana Secretary of State's Office by Stephen Rangel.  Stephen Michael purportedly sent Duffie a letter dated December 5, 2010, stating the "d/b/a SRO LIVE" on an "attached" page was incorrect.  No page is attached to the exhibit and it does not appear that anything was filed of record to correct any purported mistake in the Gallatin County records.  In fact, the August 2013 Forbearance Agreement, like the Notice of Agreement for Sale of Real Estate, still lists the buyer as "Mary Kay Duffie d/b/a SRO LIVE." The Court assigns no probative weight to Stephen Michael's December 5, 2010, letter to Duffie. The Rialto Theater was purchased by Duffie as Mary Kay Duffie, d/b/a SRO LIVE.

[5]  Stephen Michael also goes by the names Stephen Michael Rangel and Stephen Rangel.

3

California, entered into a Commercial Lease Agreement whereby Duffie, as Landlord, leased the Rialto Theater to Stephen Michael, as Tenant, from December 10, 2010, to November 1, 2013.

On May 31, 2011, Duffie also sought to purchase by Contract for Deed, from The Dead Cat, LLC, for $250,000.00,[6] a piece of property located at 215 W. Broadway St, Butte, Montana, known as the Covellite Theater. Duffie's address in the Contract for Deed is listed as 1346 The Alameda, Suite 7-205, San Jose, CA 95126. The Contract for Deed provides on page 10: "It is further agreed by the Buyer that she will not sell, assign or transfer the said premises or its interest in this Agreement without the written consent of the Seller, provided that the Seller shall not unreasonably withhold such consent."

On June 1, 2011, Duffie, with an address of 8050 Lupine Lane, Bozeman, Montana, and Stephen Michael, d/b/a SRO LIVE of 1346 The Alameda, Suite 7-205, San Jose, California, entered into a Commercial Lease Agreement whereby Duffie, as Landlord, leased the Covellite Theater to Stephen Michael, as Tenant, from June 1, 2011, to June 1, 2014.

During the summer of 2011, Stephen Michael met Steve while visiting the Plaintiffs' antique business in Butte. Stephen Michael, who the Gotchers knew only as Stephen Michael, and not as Stephen Michael Rangel or Stephen Rangel, told Steve that he had purchased the Covellite Theater. Stephen Michael gave Steve a tour of the Covellite Theater and showed Steve

---

[6] $2,500.00 was to be paid at closing, an additional $77,500.00 was to be paid by May 31, 2012, another $92,105.00 was to be paid by May 31, 2013, and Duffie was to simultaneously payoff the balance of a note owed to the Urban Revitalization Agency or assume the Urban Revitalization Agency note if approved by the Urban Revitalization Agency Board of Directors and Urban Revitalization Agency Loan Committee. The payoff of the Urban Revitalization Agency required monthly payments of $567.76 plus an escrow fee of $10.50 to start on June 18, 2011. The final payment of $92,105.00 due on or before May 31, 2013, would be adjusted depending on what was owed to the Urban Revitalization Agency.

various items that were for sale at the Theater.  Steve took Sharon back to the Covellite Theater to see the antiques and other items, and Sharon purchased a couple of items from Stephen Michael for $900.00, writing a check in said amount to SRO LIVE.[7]

Stephen Michael began visiting the Plaintiffs on a regular basis.  Stephen Michael and Steve spent time discussing their passions and goals, and Steve gave Stephen Michael a tour of Butte.  Steve was not fond of the antique business and had a desire to convert the Plaintiffs' building into a high-end entertainment venue.  Steve knew of a beer and wine license that was for sale at a price of $5,000.  Steve and Sharon did not have $5,000, so Steve approached Stephen Michael about the possibility of partnering on the purchase of the beer and wine license.  Steve and Stephen Michael agreed to partner on the beer and wine license, but for reasons unknown, the purchase of the beer and wine license was never consummated.

During the summer of 2011, Stephen Michael spent a lot of time at the Plaintiffs' business visiting with not only the Plaintiffs, but also their customers.  Stephen Michael was telling everyone about his plans for the Covellite Theater.  Stephen Michael also expressed a desire to help the Plaintiffs with their business.  To that end, Stephen Michael took Sharon to Bozeman to show her the Rialto Theater,[8] and took Sharon to Stephen Michael and Duffie's home in the Bozeman area, where Sharon was introduced to Duffie.  While Duffie and Stephen Michael never specifically stated that they were married, Sharon assumed the two were married because Duffie sometimes referred to Stephen Michael as her husband and because of pictures

---

[7] Sharon understood that "SRO" was an acronym for "standing room only," and that SRO LIVE was an entity that was formed to help young musicians.

[8] Stephen Michael also took Sharon to Missoula to show her the Wilma Theater.

5

she saw in their home, that looked like wedding pictures, and based upon the way they talked to each other.[9]

On or about August 8, 2011, Stephen Michael and Duffie appeared unexpectedly at the Plaintiffs' antique business in Butte and announced that they had a great deal for the Plaintiffs that involved a co-ownership agreement for the Covellite Theater, the Rialto Theater and the Wilma Theater in Missoula, Montana. During that visit, Duffie typed a co-ownership agreement, the terms of which were dictated by Stephen Michael. The agreement provided that the Plaintiffs would purchase a 10% interest in the three theaters for $300,000. Sharon testified that Duffie and Stephen Michael signed the co-ownership agreement; Plaintiffs did not, in part because they did not have $300,000 and in part because the agreement was "sprung" on the Plaintiffs spur of the moment. Sharon testified that Stephen Michael and Duffie were upset that Plaintiffs would not sign the agreement.

Stephen Michael returned a few days later and resumed talks about entering into a co-ownership agreement with the Plaintiffs. On September 8, 2011, Stephen Michael presented Plaintiffs with another co-ownership agreement, which was similar to the prior co-ownership agreement, except that it did not include the Wilma Theater in Missoula, and the Plaintiffs' share was $140,000, rather than $300,000. Additionally, the September 8, 2011, co-ownership did not contain any payment terms. According to Sharon, the latter agreement granted the Plaintiffs a 10% equity in the Covellite and Rialto Theaters. The September 8, 2011, Co-Ownership

---

[9] Duffie testified at an April 9, 2014, Rule 2004 examination that she had never been married to Stephen Michael and that pictures of her in a wedding dress and riding in a carriage with Stephen Michael were taken at a ceremony where Duffie and Stephen Michael "were signifying [their] significant otherness to each other."

Agreement ("Co-Ownership Agreement"), which is on SRO LIVE letterhead, recites that it is "between Stephen Gotcher and Sharon L. Westrom . . . and Stephen Michael and Mary Kay Duffie," and that in return for an investment of $140,000, Plaintiffs would "have a ten percent (10%) beneficial ownership interest" in the Theaters.  The following appears at the bottom of each page of the Co-Ownership Agreement: "URL ✦ www.SROLIVE.com TEL ✦ 1(406)579-5900 ✦ E-Mail ✦ stephen@srolive.com[.]"  Stephen Gotcher, Sharon L. Westrom and Stephen Michael signed the Co-Ownership Agreement; Duffie did not.  However, during her Rule 2004 examination, Duffie admitted typing the Co-Ownership Agreement, which included Duffie's name as a party thereto.  Duffie explained that she did not sign the Co-Ownership Agreement because it did not come into effect until the Plaintiffs paid the entire $140,000, at which time a separate entity would be formed:

> Q.     Did you type that contract?
>
> A.     I typed it, yeah.
>
> * * *
>
> Q.     You typed your name on that document, did you not –
>
> A.     Yeah
>
> Q.     – that – that this was a document that you were going to be a party to?
>
> A.     I was, yes.
>
> Q.     Okay.  Okay.  And that talks in terms of selling to the Gotchers a 10 percent interest in the Covellite Theater and the Rialto Theater for the price of $140,000; is that right?
>
> A.     If they paid $140,000, a separate entity would be created that would be owned by some of this –

Q.     Where does it say that?

A.     I don't know.  That was what I understood.  I don't –

* * *

A.     So the idea was that they would - - they would pay $140,000 - - see, that's
       significant.  They had to pay $140,000, and then this came –

The Co-Ownership Agreement provides that the combined price of the Theaters was

$1,400,000.00, that Stephen Michael and Duffie together would have a 5% ownership interest in

the Theaters, and that the remaining 85% of the Theaters would be owned by "Stephen Michael's

Company, SRO LIVE."  The Co-Ownership Agreement also provides:

> The Parties shall each make a capital investment; Stephen Gotcher and Sharon L.
> Westrom agree to make USD one hundred, forty thousand dollars ($140,000) total
> investment guaranteeing their ten-percent (10%) beneficial interest, and Stephen
> Michael (with SRO LIVE) and Mary Kay Duffie shall contribute one-million
> dollar USD ($1,000,000) guaranteeing their combined ninety (90%) ownership
> interest.  If, for any reason, Stephen Michael and Mary Kay Duffie are unable to
> meet mortgage obligations on either property, Stephen Gotcher and Sharon L.
> Westrom shall have first right of refusal for purchasing the respective Property.
> Stephen Gotcher and Sharon L. Westrom shall be entitled to 10% of the equity
> value at the closing of any potential resale.

> Accordingly, Sharon L. Westrom and Stephen Gotcher agree to pay Stephen
> Michael (via SRO LIVE) a total of $140,000 in exchange for a ten percent (10%)
> beneficial ownership interest in both Properties.  This amount shall be divided
> into to three (3) payments, and shall be made with a cashier's check according to
> the following payment schedules:

> 1)

> 2)

> 3)

After Plaintiffs signed the Co-Ownership Agreement, Stephen Michael convinced Plaintiffs to

move their inventory out of a storage unit and into the Covellite Theater.

8

The Plaintiffs made various payments under the Co-Ownership Agreement. The payments were payable to SRO LIVE. Sharon testified that several of Plaintiffs' payments were made from cash advances on credit cards. Duffie and Stephen Michael also sold a truck belonging to Steve and applied the proceeds to the $140,000 owed under the Co-Ownership Agreement. Finally, Duffie and Stephen Michael helped Plaintiffs refinance a building the Plaintiffs owned in Butte, with Duffie completing all the paperwork on Plaintiffs' behalf. The proceeds of $49,563.61 from Plaintiffs' "hard money" loan were paid to SRO LIVE.

In late 2012, when Steve was in Bozeman working on the Rialto Theater, Stephen Michael visited Sharon at Plaintiffs' antique store in Butte and told Sharon that he and Duffie needed another payment under the Co-Ownership Agreement. Sharon testified that Stephen Michael pressured and battered her for 30 minutes and that by the end of the meeting, Sharon was in tears. Stephen Michael wanted Sharon to take a cash advance on her credit cards, which Sharon did not want to do. Stephen Michael eventually convinced Sharon to take a $3,000 cash advance on her American Express credit card, and said that he and Duffie would repay Plaintiffs for the cash advance if Plaintiffs did not have funds to pay their American Express bill when it came due.

When Plaintiffs' received their American Express bill, they did not have the funds to pay the balance due. On January 5, 2012, and true to what Stephen Michael had said, Duffie wrote Plaintiffs a check, payable to Packrats Ltd/dba Gotcherstuff, in the amount of $3,000. The memo line of the check reads: "Chelsea down payment."

Sharon explained that Plaintiffs owned a home in Minnesota. Stephen Michael thought his daughter should purchase Plaintiffs' home in Minnesota, with the proceeds from the sale

9

presumably going to SRO LIVE.  The Plaintiffs never agreed to sell their home in Minnesota, and the check that Duffie wrote to Packrats Ltd/dba Gotcherstuff on January 5, 2012, was not a down payment for Plaintiffs' home in Minnesota.

Plaintiffs received periodic "Equity Interest Statement[s]" from SRO LIVE.  For instance, an Equity Interest Statement dated February 29, 2012, reflects that Plaintiffs still owed $51,651.39 on a "Realestate Contract, 1 @ $140,000.00."  Another Equity Interest Statement dated July 31, 2012, reflects that Plaintiffs still owed SRO LIVE $57,555.89.  The increase in the amount owed between February 29, 2012, and July 31, 2012, was in part due to a charge SRO LIVE added of $7,804.50 for water, insurance, utilities and property taxes.

Stephen Michael and Duffie had intimated to the Plaintiffs that they were financially well off, and that they had substantial equity in the Theaters.[10]  However, Plaintiffs later learned that

---

[10]  Duffie admitted in her Rule 2004 examination that on March 13, 2012, her home was noticed for a trustee's sale.  Duffie stated that she had done everything she was supposed to do under a home loan modification and that the foreclosure was a mistake by Bank of America. Duffie also blamed the foreclosure on the Plaintiffs, explaining to Plaintiffs' counsel at the Rule 2004 examination:

> At this time, your clients were very aggressive.  And I am, as you know, just a person on disability.  And because they were very aggressive, they prevented Stephen from having shows in his – you know, the area where he was renting.  They had all their stuff in there, and they were squatting.  And so having all their stuff in there prevented him from having shows that would allow him to make his lease payments.

> So I sometimes, you know, had to do the taxes or the insurance sometimes, and that would take out of my monthly income.  You know, I only get $3,400 a month.  And so I was trying to hold on to my theater because your clients were preventing him from having shows.

In contradiction to the above, Debtor lists her monthly income on Schedule I as $4,419.50. When asked to explain the discrepancy, Debtor stated that the monthly income on Schedule I includes $900.00 per month from Stephen Michael.

Duffie had only invested a combined $7,500 in the Covellite and Rialto Theaters.  Sharon testified that she thought that Duffie, Stephen Michael and SRO LIVE were using the money they received from Plaintiffs to make payments on the Covellite and Rialto Theaters.  The payments from Plaintiffs were apparently not sufficient; Duffie fell behind on her payments for the Rialto Theater and on August 26, 2013, Duffie, d/b/a SRO LIVE, executed a Forbearance Agreement wherein Duffie agreed to, among other things, make a payment of $18,519.00 within one day of the mutual execution of the Forbearance Agreement.  On August 26, 2013, a check drawn on the Wittich Law Firm Iolta account was made payable to First Security Bank in the amount of $18,519.00.  The memo line of the check indicates it is for the benefit of "Duffie for Rialto." According to the Forbearance Agreement, as of August 9, 2013, Duffie owed $1,184,679.31, which amount included $1,097,922.50 of principal; a $5,023.64 reduction of the November 10, 2010, purchase price balance of $1,102,946.14.[11]

In a letter dated February 15, 2012, Plaintiffs advised Stephen Michael and Mary Kay:

Due to the dissatisfaction, apparently on both sides, Sharon and I feel the need to accept your recent offer to return our money and end all future business expectations.  We are disappointed and certainly would have enjoyed the opportunity presented.

The financial pressure created and the level of risk involved is much too much.  As you know we are very conservative in our business practices as our past indicates.  We simply cannot continue on the current path.

---

[11]  Under the terms of the November 10, 2010, Agreement for the Sale of Real Estate between Duffie and Bozeman Rialto Redevelopment, L.P., and relating to $649,422.77 of the purchase price, Duffie was to make a payment of $60,439.55 on June 30, 2011.  Interest at 6.5% per annum, as provided under that agreement, calculated for one year would total $42,212.48.  If Duffie had made that payment, there should have been at least a $18,227.07 reduction in the principal balance.  The August 2013 Forbearance Agreement reflects only a $5,023.64 reduction in principal balance, which suggests that Duffie did not timely make the payment due June 30, 2011, which was prior to the September 8, 2011, Co-Ownership Agreement.

Believing that they were not getting the benefit of a 10% equity ownership interest in the Theaters, and after Plaintiffs began seeing red flags,[12] Plaintiffs quit making payments under the Co-Ownership Agreement and retained legal counsel.  Plaintiffs' counsel sent Stephen Michael and Duffie letters on March 13, 2012, and March 21, 2012, and an email on March 27, 2012.  In response, Stephen Michael and Duffie sent a letter, on SRO LIVE letterhead, dated March 28, 2012, and addressed to Plaintiffs' counsel, that reads in part:

> In terms of our civil contract dispute, your clients have failed in their specific performance requirements to pay the full and remaining balance clearly agreed upon in our *written* contract of September 8, 2012 [sic].  They are therefore without legal right to occupy the Rialto and/or Covellite theaters, per the terms of our agreement.  In the past two weeks, your clients have been notified twice by certified mail, on March 1, 2011 [sic] and on March 14, 2011 [sic], to comply with the terms of our written contract and pay the balance of $51,651.39, or immediately remove their belongings and inventory from both theaters.  Both of our default and demand letters were ignored.  As their attorney, we request that you correct an obvious misunderstanding on their part:  your clients can't have it both ways.  A partial payment in association with incomplete performance on a contract does not entitle them to partial or any interest in these properties , whatsoever, unless the contract terms are completed in full.  Because they are not the legal owners of either theater, they are illegally holding their belongings in and on *someone* else's property.
>
> Not only are they in violation of their written agreement, but the situation is exacerbated by their failure to comply with an indisputable *verbal* lease agreement.  In this arrangement, we generously allowed them to move into the theaters in advance of full payment albeit under certain terms.  This privilege was provided in exchange for making regular incremental payments to us based on sales of their vehicles and antique inventory, while they attempted to refinance their properties (which they overestimated in their value and failed to do). . .

* * *

---

[12] One such red flag, according to Steve, arose when Steve had a discussion with a person who had an ownership interest in the entity that sold the Covellite Theater to Duffie, which discussion left Steve with the impression that Duffie lacked the authority to transfer the 10% interest in the Covellite Theater that Duffie had already transferred to Plaintiffs.

> Your clients have aggravated the situation by continuing to hold "garage sales" at the Covellite Theater without our permission, and in an area that was NEVER designated for them.  Our contract of September 8, 2011, very clearly states that your clients are to use a yet-to-be determined portion of the Covellite and we are to use both the café and theater areas.  As it stands to date, they have widely distributed their "garage sale" debris throughout the café area, and in an obstinate refusal to comply with contract terms, blocked the exits there, making it impossible for us to put on shows.  This has inflicted financial and other damages preventing us, the property owners, from operating the main thrust of our business – the planning execution, and live recording of performance events.

(Emphasis in original).  Thereafter, Duffie sent Plaintiffs a Montana Notice to Comply or Quit

dated April 5, 2012, wherein Duffie states:

> Reference is made to our agreement dated September 8, 2011 and USPS certified letters sent to you on February 29, 2012, March 14, 2012 and March 16, 2012.  On the latter dates, you were notified that continued lack of cooperation with the terms of your verbal lease agreement would result in the requirement that you remove belongings from the Rialto Theaters, at the address above.
>
> If you do not immediately pay the total remaining balance of your contract amount of $51,651.39, to SRO LIVE, within three (3) days after receiving this NOTICE TO QUIT, you are required to vacate the premisis [sic], including the removal of all inventory and personal property.
>
> Please send a cashier's check by USPS certified mail to 12 West Main Street, Bozeman, Montana 59715 by April 10th, 2012 or formal eviction proceedings will imeediately [sic] ensue.
>
> If you do not pay the full amount by April 10, 2012, you are hereby notified that you will be formally served by Gallatin County Justice Court, including with an ACTION FOR POSSESSION and UNLAWFUL DETAINER COMPLAINT.

Duffie sent Plaintiffs a similar notice regarding the Covellite Theater.

Stephen Michael sent another letter to Plaintiffs' counsel on April 28, 2012, which letter

is again on SRO LIVE letterhead.  In that letter, Stephen Michael stated to Plaintiffs' counsel that

his "clients failure to complete the terms of our September 8, 2011 contract, transformed the

nature of our arrangement from a (10% interest) purchase agreement to a lease agreement with an

*option* to purchase (10% interest).  (Emphasis in original).   Steve testified that he was not aware of any rental agreement.

Thereafter, in 2012, Plaintiffs filed an action against "Mary Kay Duffie and Stephen Michael, d/b/a SRO LIVE" in Silver Bow County.  On November 19, 2012, following a hearing held October 26, 2012, "JUDGEMENTS BY DEFAULTS" in the amount of $97,960.00 was entered against both Duffie and Stephen Michael.  At the request of Duffie, her default was set aside so that Duffie could respond to the Gotchers' complaint and the matter could be heard on the merits.

During the course of the state court action, Duffie signed and filed in January 2013, an affidavit in which Duffie states that the Gotchers "suddenly, and without warning or explanation, stopped making payments as agreed according to the terms of both verbal and written agreements."   Duffie eventually filed an answer in that action on February 20, 2013, wherein Duffie asserted several counterclaims, including the following:

> 1. Set-off, offset, quantum meruit, unjust enrichment: Because of the parties' agreement, Plaintiffs were allowed to occupy the two theaters.  Since Plaintiffs seek to rescind the agreement and have their money refunded, Plaintiffs should be required to compensate May Kay for the fair market value of the occupied space.  Similarly, as part of the parties' cooperative relationship stemming from the agreement, Defendants provided to Plaintiffs valuable services (e.g. business consultation, website development, development of web-based store).  Since Plaintiffs seek to rescind the agreement and have their money refunded, Plaintiffs should be required to compensate Mary Kay for the fair market value of the services provided.

A footnote from the above passage recites:  "Almost all actions are done by Stephen for or on behalf of Mary Kay, who is a passive owner of the theater properties."  The Gotchers testified, and Duffie concurred in her Rule 2004 examination, that Duffie typed the Co-Ownership

14

Agreement.

While Duffie has denied during various proceedings before this Court that she was or is married to Stephen Michel, Duffie typed a Christmas letter in 2011, a copy of which was given to the Gotchers.  The Christmas letter was signed by both Duffie and Stephen, and was addressed to Duffie and Stephen's "Family and Friends" and references the Covellite and Rialto Theaters, stating "[Stephen] purchased two historic theaters on I-90 in Montana, and he's currently finishing a deal for a third."  Duffie refers to Stephen in the letter as her husband.[13]  Also, in a "Second Affidavit of Mary Kay Duffie" dated January 16, 2013, and filed in the Montana Second Judicial District Court, Silver Bow County, Duffie represented that the Gotchers "discontinu[ed] their regular payments, while remaining in our properties without legal permission, result[ing] in temporary financial hardship for my husband and me in the spring of 2012."

Other exhibits in the record include printed materials from the SRO LIVE website relating to the SMK Foundation.  A statement on the website states that the SMK Foundation was "[f]ounded by philanthropists Stephen and Mary Kay Michael."  Duffie was questioned about the foregoing statement at a Rule 2004 examination and denied ever using the name Mary Kay Michael:

> Q.    Okay.  And you're not the – the Mary Kay Michael that's referred to in there as one of the founders of SMK?
>
> A.    Asked and answered.
>
> Q.    Okay.

---

[13]  When asked about referring to Stephen Michael as her husband in the Christmas letter, Duffie explained during her Rule 2004 examination that Stephen Michael was her "significant other" and that she used the term husband "as shorthand."

15

A.      That is not – if you see, it says "SRO LIVE" on here –

Q.      Right.

A.      – I have never used a Mary Kay Michael.  I don't know who that is.

Q.      – it talks about the SMK Foundation.

A.      Right.  That's Stephen's foundation, not mine.  I don't know why that is.  Maybe it was a –

Q.      It says - -

A.      – mistake by one of his people - -

Q.      – it says – it was founded by philanthropists Stephen Michael and Mary Kay Michael.

A.      But I didn't found it.  I didn't write that.  As I – as I said, it says "SRO LIVE" here, "All Rights Reserved."

Q.      Okay.

A.      It has nothing to do with me.  I – I did not write this.

Q.      Is SMK related to SRO LIVE?

A.      I don't know.  It's Stephen's.  It's not mine.  It's not mine.

Q.      And you're not - you're not Mary Kay Michael?

A.      Asked and answered.

Q.      No, I asked – I have never asked that question.  Have you ever met Mary Kay?

A.      I've never known a Mary Kay Michael.

Q.      Any you've been with Stephen for how long?

A.      Asked and answered.

Q.      Twelve years?

16

A.    At least.

When asked about her affiliation with SRO LIVE during the same Rule 2004 examination, Duffie testified that she had no association with SRO LIVE, had never been a partner or shareholder, and that she had never received any money from SRO LIVE for any of her services.  Duffie explained that a discussion of Duffie on the SRO LIVE website was intended to lend "credibility to SRO LIVE as it was getting started."  When asked to further explain, Duffie responded:

> "Mary Katherine Duffie is an award winning author and anthropologist who last taught at UCLA.  Her most recent book, 'Through the Eye of the Needle," is an autobiographical account of the Maori people of New Zealand."
>
> I have won numerous awards for my writing and research and thought that this might help SRO LIVE.  It was just an offer to help lend my credibility.

Duffie sought protection under Chapter 13 of the Bankruptcy Code on December 7, 2013.  Duffie's Chapter 13 Plan filed April 28, 2014, was confirmed on April 30, 2014.  The Liquidation analysis set forth in Duffie's confirmed Plan provides that priority and unsecured creditors will receive at least $3,000.00.  As noted earlier, the Plaintiffs commenced this Adversary Proceeding on May 7, 2014, by filing a complaint seeking to except an unspecified amount from the Duffie's discharge pursuant to 11 U.S.C. §§ 523(a)(2)(B), 523(a)(2)(A), and 523(a)(4)(6) [sic], and requesting punitive damages.  On November 13, 2014, the Court entered a Memorandum of Decision and Order dismissing all but the Gotcher's claim under 11 U.S.C. § 523(a)(2)(A).

## APPLICABLE LAW

Section 523(a)(2)(A) provides that, "a discharge under . . . this title does not discharge an individual debtor from any debt – (2) for money, property, services, or an extension, renewal, or

17

refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, . . . ."  To establish a claim for an exception to discharge under this provision requires a creditor to demonstrate the existence of five distinct elements by a preponderance of the evidence:[14]  (1) the debtor made representations; (2) that at the time the debtor knew they were false; (3) that the debtor made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. *Ghomesh v. Sabban ( In re Sabban)*, 600 F.3d 1219, 1221 (9th Cir.2010); *Siriani v. Nw. Nat'l Ins. Co. of Milwaukee, WI ( In re Siriani)*, 967 F.2d 302, 304 (9th Cir.1992).

Because direct evidence of intent to deceive (the scienter element) is rarely available, "the intent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth."  *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 167–68 (9th Cir. BAP 1999); *Household Credit Servs., Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 n. 4 (9th Cir. 1999) ("reckless conduct could be sufficient to establish fraudulent intent"); *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir. 1978) ("Reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct is sufficient to establish the knowledge element.").  A bankruptcy court may find the requisite intent "where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the

---

[14]  "The burden of showing something by a 'preponderance of the evidence,' ... 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'"  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993).

truth." *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 174–75 (9th Cir. BAP 2007) (discussing intent to deceive in the context of § 727(a)).  The Ninth Circuit has concluded that the nondisclosure of material information in the context of a business transaction will support an exception to discharge claim under § 523(a)(2)(A), analogizing such a situation to securities fraud.  *See In re Apte*, 96 F.3d 1319, 1323 (9th Cir. 1996) ("the nondisclosure of a material fact in the face of a duty to disclose [establishes] the requisite reliance and causation for actual fraud under the Bankruptcy Code.")

The determination of nondischargeability under § 523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A) mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the RESTATEMENT (SECOND) OF TORTS §§ 525-557A.  *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443-44 (1995) ("'false pretenses, a false representation, or actual fraud,'. . . are common-law terms, and . . . in the case of 'actual fraud,' . . . they imply elements that the common law has defined them to include.").

### DISCUSSION

In the approved Pre-Trial Order, the Plaintiffs highlight four general misrepresentations by Duffie.  First, Plaintiffs contend:  that Duffie represented that she and Stephen owned the theaters jointly; that Duffie and Stephen had a substantial interest in the Theaters; and that under the Co-Ownership Agreement, Gotchers would have a 10% interest, Stephen and Duffie would have a combined 5% interest and SRO Live would have an 85% interest in the Theaters.  The foregoing ownership interests would be held as Tenants in Common.

Second, Gotchers argue that Duffie misrepresented the purchase price of the Theaters as

$1.4 million, when her actual purchase price for the theaters was $1,357,946.14. Third, Plaintiffs maintain that Duffie failed to disclose whether she had the consent or authority to assign an ownership interest in the theaters to the Gotchers, and finally, the Plaintiffs argue that Duffie failed to disclose: (a) Stephen's full name; (b) the fact that Stephen had committed investment fraud in California some years ago; and (c) that Duffie and Stephen were not married.

As noted earlier, Duffie did not appear at trial to refute any of the evidence presented by the Plaintiffs. Based upon the evidence, the Court first finds that Duffie and Stephen were, for purposes of the Court's decision, married during the summer of 2011. The Court's finding is based on Duffie's Second Affidavit dated January 16, 2013, that was filed in the Montana Second Judicial District Court, Silver Bow County, wherein Duffie referred to Stephen as her husband. Such finding is corroborated by Duffie's 2011 Christmas letter in which Duffie again refers to Stephen as her husband. The finding that Duffie and Stephen were married is consistent with what the Gotchers believed and is, therefore, not a misrepresentation. The Court would note, however, that Duffie and Stephen Michael's marital status has no material impact on the Court's decision; Duffie and Stephen Michael have been together since 2002 and are clearly "significant" to each other.

Plaintiffs also maintain that Stephen Michael's full name is Stephen Michael Rangel. The Gotchers failed to prove Stephen Michael's full true name, and they similarly failed to differentiate between Stephen Michael's full true name, whatever that name may be, and any aliases or stage names Stephen Michael may have used. Plaintiffs also contend, based upon an article from June 1992, that Stephen Michael committed investment fraud in California. The Court does not know where the article appeared, who authored the article or the veracity of the

20

information contained therein. The Court, therefore, assigns no probative weight to the June 1992 article. Moreover, the Court fails to see the relevance of a sanction imposed in 1992 to the present matter.

Plaintiffs also complain that Duffie failed to disclose whether she had the consent or authority to assign an ownership interest in the theaters to the Plaintiffs. Duffie admitted in her Rule 2004 examination that she never sought written permission from either The Dead Cat LLC or Bozeman Rialto Development, L.P. to assign or sell any interest in the Theaters. Steve testified that he understood, after talking with a person who was perhaps a member of The Dead Cat LLC, that Duffie did not have the authority to transfer or convey any interest in the Covellite Theater. That information is hearsay and nothing in the record establishes whether The Dead Cat LLC or Bozeman Rialto Development, L.P. would have had reason to withhold granting Duffie authority to transfer either a leasehold interest in the Theaters or transfer a 10% interest to the Plaintiffs. Because "[e]xceptions to discharge are to be narrowly construed in favor of the debtor[,]" the Court finds that the Plaintiffs have not sustained their burden of proof on this point. *See In re Neal*, 113 B.R. 607, 609 (9th Cir. BAP 1990).

Next, the Plaintiffs argue that Duffie misrepresented the purchase price of the theaters as $1.4 million, when her actual purchase price for the theaters was $1,357,946.14. The Court fails to see how this fact is material. The Court would find this fact relevant and material if Duffie was representing to the Plaintiffs the value of the Theaters on September 8, 2011. However, what she paid for the Rialto Theater and Covellite Theater on November 10, 2010, and May 31, 2011, is not proof that the Theaters were not worth $1.4 million on September 8, 2011. The Court could envision a scenario where Duffie incurred costs, such as closing costs and taxes, that

21

were included in the $1.4 million purchase price figure.  Again, Plaintiffs have not sustained their burden as to this fact.

Finally, Plaintiffs contend that Duffie represented that she and Stephen owned the theaters jointly, that Duffie and Stephen had a substantial interest in the theaters, and that under the Co-Ownership Agreement, Gotchers would have a 10% interest, Stephen and Duffie would have a combined 5% interest and SRO LIVE would have an 85% interest in the theaters.  The foregoing ownership interests would be held as Tenants in Common.  The specific division of ownership interests between Duffie, Stephen Michael and SRO LIVE is likewise neither relevant nor material in this particular case.  The Court agrees with Plaintiffs that the Co-Ownership Agreement specifically provides that Stephen Michael and Duffie were to have a 5% interest in the Theaters and SRO LIVE was to have an 85% interest in the Theaters.  The Co-Ownership Agreement goes on, however, to also reference Duffie and Stephen Michael's "combined ninety percent (90%) ownership interest."  In the end, Plaintiffs were to have a 10% interest in the Theaters and a Stephen Michael and Duffie, either individually or in part through SRO LIVE, were to own the other 90%.  The fact that Duffie continued to own the entire 90% in her sole name did not, under the facts of this particular Adversary Proceeding, result in any damage to the Plaintiffs, and is thus not grounds for excepting a debt from discharge.

What is troubling, and what the undisputed evidence does show, is that Duffie had virtually no equity in either the Covellite or the Rialto Theaters.  While the Co-Ownership Agreement references a mortgage, Duffie represents in the Co-Ownership Agreement that she and Stephen Michael would "contribute one-million dollar USD ($1,000,000) guaranteeing their combined ninety percent (90%) ownership interest."  No time frame is stated for either the

Plaintiffs or for Duffie and Stephen Michael to make their contributions of $140,000 and $1million, respectively. However, any contributions Duffie and Stephen Michael made were woefully short of $1 million. In fact, as to the Rialto Theater, the evidence shows that as of August of 2013, Duffie's equity interest was a mere $10,023.64.[15] Even if Duffie contributed all her monthly net income, shown as $1,394.50 in her schedules, to the Theaters, it would take Duffie well in excess of five years to contribute $1,000,000 toward the business venture with the Plaintiffs.

The undisputed evidence also shows that Duffie, in concert with Stephen Michael, negotiated to sell, as of September 8, 2011, a ten percent interest in the Rialto and Covellite Theaters to the Plaintiffs. Although Duffie did not sign the September 8, 2011, Co-Ownership Agreement, Duffie received benefits from the Co-Ownership Agreement and she sought to enforce the Co-Ownership Agreement against the Plaintiffs: First, in the March 28, 2012, letter that Duffie and Stephen Michael sent to the Plaintiffs' counsel wherein they alleged that Plaintiffs had "failed in their specific performance requirements to pay the full and remaining balance clearly agreed upon in our *written* contract of September 8, 2012 [sic]; second, in the April 4, 2012, Notices to Comply or Quit wherein Duffie demanded that Plaintiffs immediately remit a payment of $51,651.39, to SRO LIVE; and third, when Duffie sought to enforce the Co-Ownership Agreement against the Plaintiffs in the state court action.

Plaintiffs have established that Duffie knowingly made false representations with the intent of deceiving Plaintiffs. As stated above, Plaintiffs, Duffie and Stephen Michael negotiated

---

[15] This amount consists of the $5,000 down payment and the principal reduction of $5,023.64 as revealed in the August 2013 Forbearance Agreement Duffie entered into with Bozeman Rialto Redevelopment, L.P.

an agreement whereby Plaintiffs would have a 10% ownership interest in the Covellite and Rialto Theaters for a price of $140,000; the Co-Ownership Agreement states such.  However, Duffie testified at the Rule 2004 examination that she had no intention of transferring ownership of the Theaters to the Plaintiffs, and indeed, ownership was not transferred.  Instead, what the evidence shows, is that Duffie and Stephen Michael engaged in a scheme to siphon as much cash as possible from the Plaintiffs under the pretense that they were selling to the Plaintiffs a 10% interest in the Theaters.

It also bears noting that even if Duffie had not received the money from Plaintiffs by false pretenses, a false representation or actual fraud of her own, the Court could, under the specific facts of this case, impute the fraud of Stephen Michael and SRO LIVE to Duffie.  Just recently, the Ninth Circuit Bankruptcy Appellate Panel ("BAP"), *In re Huh,* considered the mental state for fraud set forth in *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013), in connection with the imputation of fraud under § 523(a)(2)(A) when a partnership or agent-principal relationship was found.  The BAP, sitting en banc, held that before an agent's fraud may be imputed to the debtor-principal, for purposes of the discharge exception for debts obtained by actual fraud, proof is required that the debtor is culpable, that is, that the debtor "knew or should have known" of the agent's fraud, though the debtor need not have participated actively in the fraud.  *Sachan v. Huh (In re Huh)*, 506 B.R. 257, 272 (9th Cir. BAP 2014) (en banc).

Both Duffie and Stephen Michael have done business as SRO LIVE, and in fact, Duffie purchased the Rialto Theater as "Mary Kay Duffie, d/b/a SRO LIVE."  All Plaintiffs' payments were made payable to SRO LIVE.  Additionally, the evidence shows that the SMK Foundation is

24

the "non-profit sister organization of SRO LIVE[,]" and that the SMK Foundation was "[f]ounded by philanthropists Stephen and Mary Kay Michael."  Ample evidence in this case suggests that it is more probable than not that even if Duffie did not actively participate in the fraud, she knew or should have known of Stephen Michael and SRO LIVE's fraud; the benefits of which flowed to Duffie.

Next, Plaintiffs justifiably relied on Duffie's representation that she would transfer a 10% ownership interest in the Theaters to Plaintiffs.  Plaintiffs suffered damages as a result of Duffie's failure to transfer a 10% ownership interest in the Theaters to Plaintiffs, as set forth in the Co-Ownership Agreement.  Therefore, Plaintiffs are entitled to judgment in this matter under 11 U.S.C. § 523(a)(2)(A).

As noted at the beginning of this Memorandum of Decision, Plaintiffs do not identify the amount of debt they seek to except from discharge.  The purchase price under the Co-Ownership Agreement was $140,000.  The greater weight of evidence presented to the Court, including the documents relating to Duffie's purchase of the Rialto Theater, indicate that Duffie did some business as SRO LIVE.  The Equity Interest Statements sent to Plaintiff by SRO LIVE on February 29, 2012, showed that Plaintiffs still owed $51,651.39 toward the $140,000 purchase price.  That same number of $51,651.39 also appears in the March 28, 2012 letter that was signed by Duffie and sent to Plaintiff's counsel and also appears in Duffie's April 5, 2012 Notices to Comply or Quit.  Accepting the figure of $51,651.39 as accurate, the Court concludes that $88,348.61 (or $140,000 less $51,651.39) should be excepted from Duffie's discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

IT IS THEREFORE ORDERED that the Court will enter a separate Judgment in favor of

25

the Plaintiffs, Steven and Susan Gotcher, and against the Debtor/Defendant, Mary Kay Duffie;

and the sum of $88,348.61 is excepted from Duffie's discharge pursuant to 11 U.S.C. §

523(a)(2)(A).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana